Our next case for argument is 24-1181, Shilpa Pharma v. Novartis Pharmaceuticals. Before I proceed, I forgot to welcome Judge Thum, the Chief Judge of the District of New Jersey. We're very appreciative of her coming to sit with our court today, so thank you. Happy to be here. Thank you, Judge. Mr. Boland, please proceed. Good morning. May it please the Court? Is this 11 minutes here? Thanks. There's one issue that's dispositive of all the claims in this appeal, and that is the enablement of MUTs as a prior art reference. And, of course, as a prior art reference, there must be an enabling disclosure of the subject matter that relied on for the unpatentability. And here, that's primarily the Form 1 polymorph in MUTs. But MUTs doesn't have that disclosure. There's no teaching of a chemical synthesis of how to make Form 1. And you don't like the... Well, no, I don't think MUTs discloses it either, but they look to Fujita. Fujita. Fujita. Fujita. And Fujita, because they say they incorporated it by reference. And tell me what your problems are with incorporation by reference first. Okay, so... First, let me ask, do you think Fujita discloses how to make it? Well, Fujita discloses Example 29 primarily. That was the crux of the issue below. But Fujita discloses in Example 29 how to make the fingolimide hydrochloride salt. Then, at the tail end of that example, it says, And then it was recrystallized in ethanol to give so many grams of the subject compound. Fujita doesn't say that compound was Form 1. And in contrast, MUT says it's Form 1 and it's Form 2 and 3, formed by heating, are novel. So, how do you reconcile those? I think I asked a really specific question. Is Fujita enabling? No, Your Honor, it is not. There's no case that's ever found that a prior art's disclosure of a compound has enabled the production of a specific polymorph. And further, there's no case that's ever held that even if that compound in the prior art is crystalline, that that's an enabling disclosure of the production of a specific polymorph. And yet, that's exactly what the Board did in concluding here, that both Fujita and, to some extent, this Kuruchi reference, enabled the production of Form 1. Can I just make sure I understand your argument? You're really emphasizing here the unique structure of the polymorph, right? That it's something about the polymorph, the fact that this is polymorph technology itself, makes it so your enablement argument is stronger. Am I understanding that? Yes, Your Honor. And just to be clear, polymorph formation is very highly unpredictable chemistry. And as this Court recognized in the Grunenthal case we cited at 919 F3, 1333, a crystalline compound is not necessarily polymorphic. Further, the Court recognized that only if a crystalline form can exist in multiple solid-state 3D arrangements is it polymorphic. And those are at pages 1341 and 1336, respectively. So even if Example 29 of Fujita disclosed a crystalline compound, and that's not even clear, it says the subject compound at the very end, there's no way to know whether it existed in a polymorphic form. And Mutz says it discovered polymorphism of sphingolimide hydrochloride. So how could Fujita teach and enable the production of Form I when Mutz later says Mutz discovered polymorphism, Mutz invented novel forms? What do you think Fujita meant by the subject? What do you think it meant other than Form I? It was a compound. It was an organic compound. It's not clear if it was even a crystalline compound. You wouldn't know unless you took an X-ray diffraction on that particular compound, because that will tell you if it's crystalline, you'd get peaks. If it's amorphous, you'd get broad humps. So there was no data to tell you that was Form I. There was no data to tell you that was any type of polymorph at all. But enablement allows for that type of experimentation, doesn't it? Yes, Your Honor, but in this particular context, there was three broad categories of evidence related to polymorph formation that the Board simply did not consider in its analysis. First was there was undisputed evidence that even slight alterations in the synthesis techniques will give rise to different polymorphs. Second, and both parties' experts agreed with that. Second, both parties' experts agreed that changes in recrystallization conditions could have a profound effect on the resulting crystal form of a compound. All four experts in the case agreed with that proposition. And so when Fujita says it was recrystallized for methanol to give so many grams of the subject compound, that doesn't tell you how they did the recrystallization. It involves how long did it take for each step, what were the temperatures, was there agitation, how long did it take to dissolve, did they do anything special to dissolve it, how did they bring it out of solution, how did they cool it, was it under vacuum or not? So in contrast to what Fujita says in Example 29, you can look by comparison in the 816 patent at issue here, in Column 8, Lines 30 to 47. You have Example 2 in Process A, which gives form beta. And there what you have is a detailed description of a recrystallization reaction with all the times, temperatures, agitation conditions, cooling and bringing it out of solution and drying it under a vacuum for 12 hours. That's what's missing in Fujita. That's what's missing in Kiyuchi. How did the board err to the extent that it rejected your argument about the differences between the melting points in Mutz and Example 29, and especially in light of their reliance on Dr. McClurg? How is that erroneous? Sure. Melting points is just one of several categories that wasn't properly considered in our view. But as to melting points particularly, they relied on Dr. McClurg. So Fujita got a melting point of 118 to 120. Unfortunately, the board found that in Mutz, the melting point was 107. So that's an 11 to 13 degree difference. Dr. McClurg said, without citing anything, oh, that's just within the range of experimental errors, variations, whatever. It was speculation. What the board didn't consider was Sherpa's evidence. Our expert, Dr. Mayo, testified on that exact point and gave substantial testimony that was never mentioned. He pointed out that Dr. McClurg didn't cite one single piece of literature to support it. Unfortunately, that's a fact-finding, and I don't reweigh evidence. I just have to say, was that clearly erroneous fact-finding? So you're telling me all the reasons why the board should have made a different decision, but I don't get to do that. Understood, Your Honor. But where the board's fact-findings don't take into account swaths of evidence or grapple with our evidence and say, right... It sounds like what you're saying, because the board didn't address it, they didn't consider it. And I don't know that, on what grounds can you, even assuming, to Judge Moore's point, that we even have to look that far, but how do you get there? Well, there's... We say a case of aqua products and provisor... No, my question is, how do you get that the board didn't consider it simply because they didn't address it? Maybe they considered it and rejected it, and they just didn't write about it. Yeah, so, of course, the board doesn't have to write about every single piece of evidence, every single item of testimony. But they have to address our case. And our position is it was not properly addressed, and that, therefore, those findings... Did you argue an APA violation? Yes, we did, Your Honor. On multiple aspects of not considering our evidence. And we cited the cases I just referenced. So we believe Milton's point is one of many points. But another category that wasn't considered is, there was substantial, undisputed, and unchallenged evidence explaining that if you took Fujita Example 29, undue experimentation would be required to adapt that procedure into an enabling synthesis of Form 1. Our expert gave testimony on that. It was unrebutted. He was not even deposed. And that was just simply, again, ignored by the Patent Office. McGlurk didn't address that? I don't believe so, Your Honor. Because the board found McGlurk credible. We certainly don't like credibility. I don't know that Dr. McGlurk... I can't point to where he addressed that as I stand here. So, if you... Can I ask you about the incorporation by reference? Yes, Your Honor. Because you do make that argument. Yes. And your adversary says that that applies in the patent application. Do you have any cases that you can cite where 1.57 has been applied in this type of context? Not specifically, Your Honor. But we don't have a case that says it doesn't apply in this context. And on its face, the rule does not say it does not apply. Fair enough. And then, further on incorporation, of course, you've got the advanced display standard. And we argue, and I'm not going to go through everything in our brief, but we argue that it wasn't a specific enough incorporation. There was competing documents. It did raise the question, though, how specific do you need to be in your view, you said. Yeah, here it said the relevant disclosure is incorporated. The relevant disclosure of Fujit is incorporated by reference. The board found that that was the synthesis of Fingoli mod hydrochloride. Okay, so that's example 29. Okay, I look at it, and this is how we briefed it. That incorporation appears in a discussion of the prior art. It's on page one of Mutz. It's in a discussion of the background section. And we think that the incorporation may have just as easily been to sort of incorporate the state-of-the-art as many patents do. And that's non-essential subject matter, state-of-the-art. Okay, a critical synthesis, okay. Who would incorporate it from a sentence in the background describing the prior art? And again, how could that possibly square with Mutz's statement that his polymorphs were novel and that he discovered that this... There is no law saying that you cannot incorporate enabling subject matter into your specification, right? I think if it's... I think maybe that used to previously been something that the PTO required, but that has since changed. I think you can if it's a U.S. patent or U.S. application. And here, it's sort of the reason I started the way I did, not with incorporation, is regardless of incorporation, the PTAB went on to find the prior art to be enabling. Okay, and to me, that's the crux of it, and I've given the reasons, and just briefly, the reasons why if you accept that you can't go from a compound to a polymorph simply by saying recrystallization, quote-unquote, okay, but there was two major errors that the PTAB committed in analyzing all of this evidence. First, the PTAB considered all fengolimide hydrochloride basically to be much form one, okay? We summarized all those findings at pages 28 and 29 of our opening brief, okay? So everything is fengolimide hydrochloride, but we proved that there were multiple other forms that were known at pages five to six of our brief. We outlined there were several forms... I don't know if you realize this. You're using all your rebuttal time. Do you want to save time? Yes, I'll save the rest. Okay. Thank you, Your Honor. Mr. Jay, please proceed. Good morning, Your Honors. May I please support William J. Friend of Artists? On the place where my friend began, enablement of MUTs, I just want to set the stage by noting, right, as some of the questions point out, that this would be a fact question, that there is a presumption that prior art references are enabled, and so Shilpa bore the burden on that point before the board. Could you just really address what I think is one of the plaintiff's strongest points, which is that MUTs said and claimed a novelty over Fujita. So doesn't that imply that Fujita does not teach how to make the form? I don't think so. Let me answer that in two steps. The thrust of my answer is going to be that MUTs adds to Fujita's disclosure. In other words, it's not as if MUTs discloses nothing. Fujita discloses how to make fingolimide hydrochloride. MUTs discloses how to get from there to the previously not known polymorphic form. So in other words, Fujita is not doing all the work and MUTs none of the work. Fujita adds what our friends on the other side say is this missing step from MUTs, which is synthesis, but then as the board explains, it does this twice, and I think pages 125 and 131, both in the context of Fujita and also in the context of Kiyuchi, it says it again, that once you're able to make fingolimide hydrochloride, you can use XRPD to conclude what form do you have, and you can raise or lower the temperature to convert what you have into form one. The second point that I was going to make is a more fundamental one, which is it doesn't matter whether MUTs was itself novel in the sense of whether MUTs was anticipated for it to be a prior art reference that can anticipate this patent. So ultimately I think the question whether MUTs is novel in the sense of being anticipated is sort of a sideshow, but I think the first part of my answer is the thrust of it, that Fujita or Kiyuchi could tell you how to make fingolimide hydrochloride, and then you would combine that with MUTs' own teachings about the XRPD profile of form one, form two, or form three, and the teaching, which is at page 1981, about raising or lowering the temperature for these forms to be interchangeable by changing the temperature. So I think that my friend on the other side didn't really deal with Kiyuchi. A couple important points to note about that is that they had no expert evidence on Kiyuchi either, so the thrust of their argument was just really that the if you look at the text of Kiyuchi, it doesn't say that it's producing the right crystalline form, and I think the board deals with that in pages 130 to 131. It doesn't matter whether Kiyuchi itself produces form one, the question is whether you can use the teachings of Kiyuchi combined with what MUTs tells you about the XRPD profile to enable the teaching of MUTs, which is how to identify fling polymorphs. I think your response laid it out better than the written submission, so thank you. I appreciate that. Thank you, Your Honor. So on the enablement point, that really is the thrust of our point, that this is a reference that's presumed to be enabled, that the board found for two different reasons was enabled, and those findings are supported by substantial evidence, and we certainly disagree with that. What about the APA argument that they're making? So the APA argument is just an argument that the board's decision was arbitrary and capricious because it did not give sufficient discussion to, for example, an important point. You will find a discussion of the melting point differences, for example, in the board's decision, and as I think Judge Baum mentioned to my friend, they credited our experts' conclusions on that point. They certainly did not have to expressly address Dr. Mayo's testimony. They certainly addressed Dr. Mayo at a number of points. Pages 125 and 131 are places where the board gets into his testimony. Indeed, there was one aspect of his testimony, paragraph 140, where they took to him to be making an admission that was helpful to our side of the case. So they certainly read through the testimony. They weighed the competing expert testimony against each other. They identified certain aspects where there was no fact dispute, but where there was, I think it's in page 130, they expressly credit Dr. McClurg, our expert, over Dr. Mayo, their expert. And on this melting point point, we don't need to establish that all thingolimod in the world is thingolimod hydrochloride form 1 or form beta at a particular temperature. We just need to establish that Mutz had possession of, or Mutz teaches form 1, and that form 1 at room temperature is the same as the claimed form beta. And that's what the board made a classically scientific finding on a classic expert dispute. They refereed the dispute, and they came out in our favor. I think those are the points that I wanted to make about Mutz and Keiichi and Fujita. Unless the court has questions about any of the other issues? I have a question about peak 4. Of course. So if I'm understanding this correctly, it's your position that the DSD peaks merely describe behavior, right? I would say properties. And they're just properties of a compound that can be disregarded, right? Right so far? Yes. Okay. At least for peak 4. That's the only peak we're talking about, and I'm not making so broad a statement as that no DSD peak is ever relevant. That's not my question. How far going out do these DSD peaks, because your argument in this case is one thing, but what would be the ramifications in other patents? Are they ever patentable claim limitations? I think they could be. And so the only thing that the board held here is that this peak, which remember, so the claim language is to crystalline form beta. Once you've gotten up to the temperature at which you would find peak 4, we're no longer dealing with crystalline form beta. It's like a nothing. It's a liquid that has lost its crystalline characteristics, and I think the right word is that birefringence, which is the aspect of crystals that splits light, has disappeared at 230 degrees, and we're well above that. So the board said appropriately in the first of its two points on this question that it isn't even really a property of crystalline form beta that we're talking about up at peak 4. Now that wouldn't be true of the lower peaks, and so it might well be the case that you could describe, you could identify a polymorph by saying, this is the temperature at which that polymorph shifts to the next one, which in this case would be shifting from solid form 1 to solid form 2, as taught in Mutz. But of course that peak is disclosed in Mutz, and so that doesn't help the other side. I have a serious issue with that part of the board's opinion, because to me that might indicate an inconsistency in the claim that causes some sort of indefiniteness problem. But to say that you can just ignore that limitation, I don't know of much case law that would support that. And let me further just elaborate that I read Wilder and some of these other cases as more aptly saying that those limitations aren't going to change whether a claim is novel or not, because the property that is being described is likely inherent in the composition that was already known. And that that is a more consistent way to describe it with our case law rather than saying you can just ignore a claim limitation. What do you think of that? So let me focus in on whether Wilder and Inherency are the same thing, because I think that's really the thrust of your question. I don't see them as being exactly the same thing. In this case they would get to the same point, but of course the board didn't reach, and we did argue Inherency in the alternative, the board didn't reach it. The reason I don't think they're the same thing is because of the discussion in Wilder and Titanium and Spada about the fact that this is a rule about composition of matter claims specifically, whereas Inherency obviously is a broader principle about the law of anticipation for any type of prior art and any type of claim. But the principle is that you can't take a compound that's in the public domain, that's been disclosed in the prior art, and make it patentable by disclosing a property, even a previously unknown and non-obvious property that that compound has. Is it because that property would have, even if it wasn't known, would have been necessarily part of the composition? I think that as a factual matter that's going to be true, but as a matter of this Court's law and things like burdens and quantum of evidence, I think that the Court in Wilder and Titanium saw it not as Inherency, but as an aspect of the law of anticipation for composition of matter claims. Once you have the composition of matter, we've established what, I'm oversimplifying here, but what atoms in what arrangement and what conditions, then how it behaves, whether that's corrosion resistance, as in Titanium, or non-irritation, as in Wilder, or having a dissociation peak like Peak 4. Those are just aspects of the compound that don't make an anticipated compound patentable again. And I think in this case, this just gets back to my answer to Judge Brum about how broadly are we asking you to rule? And the answer is not broadly at all, because in this case, it is not as if Mutz said, and there is no peak up at where Peak 4 is, it just doesn't expressly disclose Peak 4, and there are factual reasons in the context of this compound, at this temperature, using this experimental method, and so on, why you might well expect that the Mutz experiment just didn't do DSC up to Peak 4, but we put in evidence for why, nonetheless, that is where that molecule begins to dissociate, and nothing about that has to do with the fact that you started at Form 1 down at room temperature, if that makes sense. Unless the Court has any further questions about either this point, or claim construction, or anything else? No. Thank you, Your Honor. Thank you, Counsel. Is this my time? Briefly, just to wrap up the enablement, I was saying all of Fingolimod hydrochlorides are not Mutz Form 1. Take a look, please, at pages 5 to 6 of our opening brief. We list many different polymorphs of Fingolimod hydrochloride. Second, it's not accurate to say that simply cooling Fingolimod hydrochloride gives you Mutz Form 1. All that Mutz says, and this is at Appendix Page 1983, is that if you cool Form 2 or Form 3, you can get back to Form 1. So if you start with Form 1 and heat, and you get 2 or 3, you can cool and get back. It's not cooling any Fingolimod hydrochloride that gives you Mutz Form 1. And Kiyuchi simply taught another way to make Fingolimod hydrochloride than Fujita, but that's not Form 1, the same as Fujita is not. And what the board said at 1.30 to 1.31 is that because Mutz teaches that Form 1 is obtained by cooling Fingolimod hydrochloride below 40 degrees C, that has nothing to do with Kiyuchi. Kiyuchi wasn't heating anything, and cooling what Kiyuchi got would not give you Mutz Form 1. In terms of anticipation, we'll stand on our brief in terms of Peak 4 being improperly removed from the claims, and there is evidence showing that at the high temperatures of 265, 270, different polymorphs give different results. In 8.16, you get an endothermic peak. When Mutz tested his Form 1 back in the olden days, he got a different peak. And the 005 patent we briefed also shows different peaks at that temperature. One is exothermic. The other showed no peak at that temperature. Thank you, Your Honors. Thank you. With counsel, this case is taken under submission.